O'NEIL vs. MURRAY.

*In the matter of proving the last Will and Testament of* PATRICK McKEON, *deceased.*

A WILL contested on the ground of alleged habits of intemperance, and allegations of undue influence, admitted to probate.

Where there are circumstances to excite suspicion as to the procuration of the instrument, it is proper to enquire how far the will was conformable to the views and motives of the decedent. Undue influence may be inferred from circumstantial evidence; and where the testamentary dispositions are unnatural, unreasonable, and not easily accounted for, unless upon the hypothesis of persuasion and improper influences, the court will require clearer proof to sustain the transaction than would otherwise be demanded.

Statements of testamentary intentions to casual acquaintances, are by no means safe indications of what is seriously designed; but where they agree with the terms of the will, and appear to have been made repeatedly, to a number of persons, and through a considerable space of time, and where they are not controverted by evidence of alienation from the legatee, or greater affection for other parties, their weight is largely increased, so as to render them an important element in the support of the will.

H. F. CLARK, *for Executors.*

T. J. GLOVER, *for Contestants.*

THE SURROGATE.—The decedent died on the 24th day of January, 1855, and the will propounded for proof bears date on the sixth of the same month. The subscribing witnesses prove the formal celebration of the will, in conformity with the requisitions of the statute, but it is alleged on the part of some of the next of kin, that the instrument was procured to be made by means of undue influence, when the decedent was in a state of enfeebled mental capacity occasioned by sickness and intemperance. The instrument provides for the payment of the decedent's debts and funeral expenses; the erection of " an appropriate tombstone, to be not less in

value than three hundred dollars;" a legacy of three hundred dollars to Margaret Murray, the decedent's niece; a legacy of two hundred dollars " to the poor and destitute widows of the parish of Mohill, in the county of Leitrim, Ireland;" and then bequeaths all the residue of the estate to the decedent's godson, Terence Reynolds, with a gift over to his brothers and sisters, in case of his decease before majority, without issue. The parents of the residuary legatee are authorized to apply and invest the money left to him till he attain full age, in such manner as they shall deem best for his interest. Daniel Kelly and Patrick O'Neil are appointed executors.

I shall first consider the evidence directly bearing upon the mental and physical condition of the decedent, before and at the time of the performance of this act.

The contestants produced four witnesses, and but three of these testified adversely to the decedent's competency. Thomas Gilroy, a second cousin of the decedent, and well acquainted with him and his connections, testified that McKeon was habitually a " pretty hard" drinker; he saw him frequently, and for about two months previous to his death, visited him once or twice a week; was there on the 27th or 28th of December, the 6th of January, and again about a week after. He says McKeon was always under the influence of liquor. At his first visit he was intoxicated, was lying in bed, " did not say much;" at the next visit, " he was in the same way;" the witness took him brandy out of the store twice, at his request. He says, generally, that there were decanters and glasses on the table by the bedside, said to contain wine: " I used to help him out of these decanters, three or four times while I would be in the room, putting my hand under his head, and holding the glass to his mouth; he was not able to help himself." Gilroy states that on the 27th of December, McKeon " was more intoxicated than usual;" that on the 6th of January, Mr. Reynolds removed some glasses from the table, as he went into decedent's room; McKeon, he says, " was intoxicated on the 6th of January,

the same as I always saw him, and worse, I thought." He was lying on his left side in the bed, with his face away from the door, and asked Mrs. Reynolds who it was that came in; she informed him, and then the witness inquired how he was, "he said he felt bad enough—not many words more did I have with him, I thought he was angry with me, he did not speak many words. * * I never saw him as he was that day, he appeared to be weaker; I did not stop many minutes, he fell off in a slumber, I thought;" he "knew me, called me Tom, * * made a motion to turn his head, but could not; he said nothing more, appeared to be dozy." Gilroy also says, "he often said he prayed to God he might get out of that place, that as soon as he got better he took liquor, and it knocked him down again." I find nothing in the few details given by this witness of McKeon's conversation, evincing inebriation, but, on the contrary, whatever he said appears to have been sensible enough. We are, therefore, narrowed down to the judgment of the witness based upon external appearances; and in this connection we must bear in mind that the decedent was sick in bed, nearly helpless so far as concerns physical motion, and therefore not in a situation to evince all the usual symptoms of intoxication. Gilroy stated broadly, that McKeon was intoxicated every visit he made him in his last illness, and that on the 6th of January, the day the will was made, he was "worse." On closer inquiry, however, he stated that on the 6th of January he could not say that McKeon was "drunk," because, to use his own expression, "he did not speak words with me,"—"I looked over into his face, he could not turn his head, I smelt his breath, it smelt of liquor. He was weaker in his speech that day, and did not turn his head, though he did so at other times. I have no other reason, than as above, for thinking he was intoxicated that day." It is noteworthy, that this witness admitted on cross examination, that at the first visit to McKeon, he himself was "high."

Margaret Degan, whose maiden name was Gilroy, a second cousin of the decedent, saw him three times during his illness:

first, about eight days before Christmas, when, she says, "he talked foolish, as if he were after a great fatigue of liquor; he talked upon such subjects, and in such a way, that I thought he was in liquor; when he was sober he would not talk so." The decedent drank once at this interview. The conversation given by the witness contains no token of inebriation; he recognized her, assigned a reason for not changing his quarters, gave her the number of an apothecary in the Bowery where to get a plaster, and, when she proposed coming again on a certain day, reminded her that would be Christmas Eve. She saw him again on the second of January, when he requested liquor, but it was refused; and lastly, the Sunday before he died, when he was sober. At the first and second visits, the witness thought McKeon was intoxicated.

Mary Stubbs, the sister of the last witness, visited McKeon on Christmas Eve. She states that liquor was ordered three times in four hours—brandy for McKeon, and hot stuff for her and a companion; McKeon drank all of his, but she only tasted her glass; that he was intoxicated, but she was not.

This is about the sum of the direct evidence on the part of the contestants, in respect to the intemperate habits of the deceased during his sickness. It proceeds from one family, who agree that McKeon was intoxicated on every occasion but one, when they severally visited him; and yet, for the last month of his life, they show but two or three occasions when he drank in their presence. Nor does the intercourse between the decedent and these witnesses contain any intrinsic evidence of inebriation. McKeon's declarations that he was Reynold's "best customer," that he had a bill against him "as long as his arm," he could not eat, "he was drinking too much," together with the other proofs in the case, doubtless lead to the conclusion that he was in the habit of drinking; but I am not satisfied that either generally, or at the times mentioned by these witnesses, it was carried to the extent of intoxication.

Now let us look at the other side. The Rev. Mr. McAleer saw him on the 10th and 11th of November, and on the latter

occasion, McKeon having asked for a glass of liquor on the table, the priest suspected he had been drinking. He says, " he admitted he had been taking too much, but said that he could take nothing else." * * " I scolded him for using the liquor, and begged him to leave there. He said he was not properly treated there, and that he did not believe they had a good motive in retaining him there. He expressed regret that he had not gone to the boarding-house he and I engaged in Canal street, in 1852, and he said, ' I may blame the importunities and blandishments of Pat Reynolds, for not having done so.' He desired me on two or three occasions during that interview, to see if there was any body in the ante-room, the next room. It was occupied by the family for a sleeping room. The times I went, there was no one there; the last time I heard a footstep. I told him so, he then remarked it was strange (he spoke rather loudly) he could have no uninterrupted intercourse with his friends, and he asked me how I got up—if I was detained on the way. I told him that, as usual, I was, and he laughed. He then spoke of his determination to leave, as soon as his health would permit him." * * " He told me what was in the box; he said his will and bank books were there." This same witness saw the decedent again about the middle of December, and testifies that he " was in the perfect possession of his faculties and sober ;" and he was " astonished to see him so much better." He also says, " when he called to see me he was always sober, and when I was with him he was always sober. But he told me he was in the habit of drinking too much at Reynolds'." * * " So far as my personal knowledge goes, I cannot say he was a drinking man, but I heard, and he admitted to me, that he spent a good deal for liquor." In consequence of this, the witness states, he advised him repeatedly to leave Reynolds' house, but McKeon said Reynolds would not let him go, but had reduced the price of board, as an encouragement to remain. This circumstance I do not understand to have occurred during the decedent's last illness, but from its connection with engaging rooms in Canal street, it would seem to have happened before.

The Rev. Mr. O'Callaghan visited the decedent, officially, six or seven times during his last illness. He testifies, " I did not, that I remember, ever see him without the full use of his faculties. I never saw him drunk—I never saw him under the apparent influence of liquor." This witness stated that, once or twice in the morning, the decedent seemed to be " in a state of torpor, wearied out after a sleepless night;" but this appearance was not as I judge indicated previous to the execution of the will.

Dr. O'Reilly attended the decedent, professionally, during his last sickness, six or seven visits. He defines the disease as debility, consequent upon old age, and chronic bronchitis. Except on two occasions, when he was asleep, he describes the state of his mind as " clear," and says, " he was always a man of clear mind—he was a shrewd, clear, intelligent old man. He appeared to be a good deal above the sphere of life in which I found him." * * " He was just as sound of mind the last visit I spoke with him, as he was before, as I ever knew him before. This might be about ten days before his death." The physician testifies that he prescribed nourishment and wine for the decedent, three or four glasses in the twenty-four hours; that he never perceived any appearance of the effects of liquor, and McKeon never drank anything in his presence. Francis Reynolds testified that he saw the decedent once or twice a week, while he was sick; that he observed no change in his mind, and, though physically debilitated, " he had his mind to the last." He states that they sometimes drank together, McKeon taking wine, but not more than once on any single occasion. Mary Reynolds deposed, that she visited McKeon frequently, and "never saw him in liquor after he was taken ill," though she had observed him in that condition some time before. She stated that on the evening of the 6th of January, she took a glass of wine at Reynolds' house, and gave McKeon a few teaspoonfuls from another glass. Sarah Monahan, who saw the decedent several times during his sickness, says, " he talked as sensible when I saw him, as when I saw him first when he

was well. That was the way at all times, when I saw him. I never saw him sleeping. I did not stay there long. I never saw him out of his head or flighty, and I did not see him in liquor. I saw him taking a drink sometimes, not more than one drink at the same sitting. I drank with him very seldom." James Conlan visited McKeon in his last illness, and never observed any mental disturbance. Julia Monahan saw him daily, waited on him and conversed with him, and she says, "he was always very sensible, and knew what he was doing." * * "He ate generally during his sickness, except the last week or so." The witness helped him "to a spoonful of wine to wet his lips," but did not know of his having brandy or other liquors, and never saw him "under the influence of liquor."

I pass, in the next place, to the evidence of the subscribing witnesses, in relation to the circumstances attending the execution of the will. James Robinson, one of the parties who attested the will, states that, "from the decedent's manner and behavior," he thought he was "rational," and he adds, "there is no doubt at all upon my mind about that." * * "I should suppose he was perfectly sober and sensible; he may have been under the influence of liquor, but I did not observe it." It appears also from his statements, that on his entering the room, McKeon recognized him, although their acquaintance had been but slight; that, during the ceremony, the door of the room was closed, and Reynolds came in twice upon call, but left as soon as the object of his attendance was accomplished; that the decedent sat up in the bed, signed the will without assistance, and that whilst in the act of finishing his signature, the ink failing, he remarked, "I tried to make a flourish, and could not;" and finally, on being told it was necessary to destroy the old will, he set fire to it himself, and it was destroyed.

Mr. Hart, who drew the will, testifies that he was called upon by Reynolds, the day the will was executed; at his request attended the decedent, drew the instrument in McKeon's presence and pursuant to his instructions, and that

no other person was present during the time of its prepara-
tion.   He says that the decedent drank about a wine glass
of what appeared to be port wine, while he was there, and
a portion of another glass, " about enough to keep his lips
moist," but he showed, however, " no signs of intoxication."
After talking about the will some time, McKeon appeared
to be fatigued, turned over in the bed, and seemed to be
dozing for a few minutes, then roused himself and continued
attentive during the remainder of the interview.   He was
very weak and unable to carry on a continued conversation,
so that it took full three quarters of an hour to arrange the
testamentary dispositions he desired to make, and more than
three hours were occupied in the consummation of the entire
affair.   Mr. Hart at first made a memorandum of the provi-
sions directed, and then drafted the instrument.   After it
was drawn, he read it to the decedent, and asked him if he
thought it right " to leave his niece but $300, and to give the
boy so much money."  *  *  " He hesitated a minute, or a few
seconds, before he made an answer, and then asked, ' how
much will the boy have after paying these sums.'   I told him,
from the rough addition I made, I thought it would be about
$2000.   He then said, after a minute or a few seconds reflec-
tion, ' I wish to leave the boy everything, but will pay these
sums.' "

Such are the leading facts of the case, bearing upon the
question of testamentary capacity, and it is obvious that there
is no proof whatever detracting from the decedent's general
competency to make a valid disposition of his property.   In
consequence of his previous habits, his debility, and failing
health, some degree of stimulus was indicated, medically,
and was prescribed by the attending physician.   But with
the exception of three witnesses produced by the contestants,
not one out of a large number of persons who visited him
frequently during the course of his illness, including the
physician and two clergymen, observed any marks of intox-
ication.   There is not sufficient ground, therefore, to presume
inebriation at the time of the *factum* of the will, nor to throw

the burden of disproving it upon the proponents. The facts attending the preparation and execution of the instrument, are consistent with a mental condition adequate to the performance of a valid testamentary act; and there can be no reason why the will should be rejected, unless it was procured by means of undue influence. There are circumstances in this connection tending to excite suspicion, and rendering it necessary to inquire how far the will was conformable to the views and wishes of the decedent, if a just idea on this point can be gained from the evidence outside of the contents of the instrument. Most, if not all, of these circumstances are of such a nature as to be susceptible of explanation. For example: to a clerical friend, the decedent excused his failure to find another place of abode, by pleading the " blandishments" of Reynolds, but, at the same time, he himself was manifestly unwilling to leave; while, to other parties, he expressed gratitude for the kindness he had received. He was suspicious of being too much observed, but there is no evidence of his being denied to his friends, or of any intrusion upon his intercourse with them. A short time previously, he had confided to the Rev. Mr. McAleer, the sum of $100 for his funeral expenses, and in the last will appropriated $300 for a monument; still this change is congruous with the fact that the benefactions to his relatives being diminished, a larger margin was left for an indulgence of this kind. Mr. Hart states that Reynolds accompanied him to the house, when he proceeded there to draw the will, and, on the way, communicated the names of the executors, and said that McKeon intended to bequeath his son five hundred dollars. He affirms, however, that he said nothing to the decedent suggesting this gift, although he told him what he had heard in relation to the executors. Still, mere suggestion is not unlawful, but there must be some ground for inferring undue influence. It is not necessary always to show this by direct testimony of the fact, but it may be deduced from circumstantial evidence. In this manner the inquiry often arises as to the situation of the decedent, the state of his family relations, the condition

of his affections, and the probability of his having intended to make such provisions as are contained in the will.  If, after such an investigation, it appears that the disposition is unnatural, unreasonable, and not easily accounted for, unless upon the hypothesis of persuasion and improper influences, the court will require clearer proof to sustain the transaction than would be otherwise demanded.  The contestants have not shed much light upon this branch of the case—they have not shown such relations between the decedent and other parties as tend to indicate any settled bias or inclination in favor of the relatives; but, on the contrary, they have proved that, when in full possession of his faculties, and in an improved state of health, McKeon sent for his will, which had been entrusted to the Rev. Mr. McAleer, for the avowed purpose of making alterations.  It appears, also, that the immediate determination to have his testamentary matters adjusted, was adopted by the decedent at the suggestion of the Rev. Mr. O'Callaghan, brought about by the wish of Reynolds to have the disposition of $800, placed in his hands by McKeon, settled and disposed of; and the matter was a subject of conversation between the decedent and the priest, both before and after it was consummated.  These circumstances, and the proofs relative to the decedent's disposition in favor of Terence Reynolds, are sufficiently important to justify a more detailed examination.

It is proved that the decedent had executed a will some time previously, in which the Rev. Mr. McAleer was named executor.  By this instrument his property was distributed among his relatives, except a legacy of $50 or $100 to Terence Reynolds, and $400 for the benefit of the poor in Ireland.  On the 10th of November, 1854, he sent for the Rev. Mr. McAleer, who finding him unwell, advised him to go to the hospital.  To this McKeon agreed, but the next day when his friend called with a carriage, according to arrangement, he was " very unwell," and declined going, but " for fear he should die," placed in the hands of the priest a box containing his will and bank books.  Two or three weeks before this,

he had given the priest $100, "to cover funeral expenses, fearing he was going to die," and he now requested him "to have that money in readiness." The Rev. Mr. McAleer visited the decedent again about the middle of December, in consequence of a written request to call and bring the box. He says, "I think he wrote me a note * * it strikes me he said in the note, he wanted to make some alteration in the will. I am not positive." The witness found McKeon sitting up, in the same room with Mrs. Reynolds, his health much improved. He returned him the box, and the $100, given for funeral expenses, and, after a short interview, left.

The Rev. Mr. O'Callaghan testified, that at first the decedent spoke to him "about his affairs, and said they were in the hands of the Rev. Mr. McAleer." He adds, "about a week after, I believe, he said he wished to make a change or something of the sort. I suggested he ought to have it arranged immediately, I was desirous his mind should be at rest. I don't remember any particular change he proposed. I never heard from him what he had, or how he intended to dispose of it. I think he once mentioned about making some compensation to Mr. Reynolds, if that were not in his former will. He never said anything to me about his godson. I saw him afterwards, when his lawyer had been there in the mean time, and he told me it was all arranged—his worldly matters—I asked him if his mind was at rest, he told me yes, everything was arranged, the lawyer had been there." Again, "two or three visits subsequent (to the first) he said he wasn't pleased with the first will, wished to make a change." * * "On the second or third visit, I asked him again about his affairs, and he said he wished to make some return to Mr. Reynolds, as far as I can remember * * the rest that was said during that interview was on spiritual affairs. He said that was the only thing annoying him, and I have some indistinct idea he said something of the ingratitude of a niece."

Francis Reynolds states that McKeon, shortly before his death, speaking of Terence Reynolds, "said he would leave that child something that would carry him through life, and

give him an education." He says, also, "he told me that if all who belonged to himself were about him, he could not be treated better than he was in Reynolds' house: * * he spoke of his own relatives,—I believe I asked him if he was determined to leave them something at his decease, he said he did not, they were unworthy of it; that was his language, he went into particulars." John O. Beirne testified, that, as far back as a year before his decease, McKeon told him he had a will made, " which he wanted to change," would leave the witness a hundred dollars, and as to Terence Reynolds, his godson, " would leave him what would educate him and make a man of him." Again, " sometimes when I went into Reynolds', I would find him with this boy on his knee, and he would say, what a fine boy he was, that he would take care of him any how. He mentioned that he was cool, particularly, with some family here in New-York, named Gilroy." Mary Reynolds, an aunt of Terence Reynolds, and one of the sponsors at his baptism, deposed that at an interview with the decedent, on the evening of the 6th of January, he informed her " he had a lawyer there to-day, and that he changed his will, and that he left his godson and mine what would educate him and make him comfortable, and the rest of the parties belonging to him, he didn't leave much to; but that he left something to Mrs. Murray, which she wasn't worthy of." The witness also stated, that previous to this occasion, McKeon had told her he intended to change his will, and make some provision for his godson. John Tighe testified that the decedent frequently conversed with him in regard to his godson, and said, " he would leave him what would educate him and help him go through life." Sarah Monahan, the nurse of Terence, says, that McKeon often told her he would leave the boy " as much as would educate him, and keep him comfortable during his life, if he could" * * " he said he would leave it in his will if he died." James Conlan states that he had frequent conversations with McKeon in relation to his intended testamentary provisions, that McKeon stated, " he was not well used by his friends," and expressed the inten-

tion of modifying his will, of making " a change in favor of
Reynolds' son," and leaving him " as much as would make
him comfortable, and make a man of him." The witness
visited McKeon in his last illness, and says, " he was uneasy
to get his papers," to make a new will, " he was not well
used by his friends * * he would not leave his friends his
money, they were not worthy of it * * he would make his
will in favor of Reynolds' son." Julia Monahan, who was in
the employment of Reynolds, and attended upon McKeon
during the course of his illness, affirms, that he spoke of
Terence, his godson, and said, " he would leave him easy."
Michael Reynolds testifies that he visited McKeon the even-
ing of the day the will was made, and learned from him that a
lawyer had been there, a will had been executed, and he had
left the lad, Terence, enough to educate and " make a man of
him;" that " he had done nothing for his friends, except Mar-
garet, and he had left her more than she deserved." I am
well aware of the impropriety of relying too much upon the
oral statements of a person, as to his testamentary intentions,
to casual acquaintance; that they are often made at random,
and are by no means safe indications of what is seriously
designed. But when they agree with the terms of the writ-
ten will, instead of being repugnant; when they appear to
have been made repeatedly, to a number of persons and
through a considerable space of time, and where they are
not contradicted by evidence of alienation from the legatee,
or greater affection for other parties, their weight is largely
increased, so as to render them an important element in the
support of the will. There can be no question, that it was in
the decedent's mind at an early period, to make some bequest
to his godson. This was evinced in his first will; as time
passed and the lad grew, it was quite natural that the dispo-
sition in his favor should grow with increased familiarity, and
when in connection with frequent declarations of his inten-
tion in this respect, we find him, at a time when his mind was
clear and his health comparatively good, sending for the first
will, and evincing deliberately the design of modifying it, all

ground for imputing the exercise of improper influences over him would seem to be removed. It has been urged that the limitation of the bequest to Terence, on his decease under twenty-one, over to his brothers and sisters, betrays such extraneous interference; but I cannot perceive the force of the suggestion. The gift was, in the first instance, made absolute, and on the death of the legatee before majority, would have passed to his father. The father's interest, therefore, was against this limitation. Upon the whole, and after most careful consideration, I am led to the conclusion that the will ought to stand; that the additional proof for which the court should call, beyond the mere *factum*, has been supplied from declarations as well as other circumstances, and that the instrument, judging from the light we possess, contains the wishes of the decedent respecting the disposition of his estate. There must, therefore, be sentence of probate.